IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

AMY SHARP,                                )
    Plaintiff,                      )
                            )
        v.                          )      Civil No. 3:14cv340 (HEH)
                            )
CAROLYN W. COLVIN                         )
Acting Commissioner of Social Security,   )
    Defendant.                      )
_____)

## REPORT AND RECOMMENDATION

Amy Sharp ("Plaintiff") is forty-three years old and previously worked as an office assistant, payroll clerk and insert operator. On March 19, 2010, Plaintiff protectively filed for disability insurance benefits ("DIB"), claiming disability from fibromyalgia, chronic fatigue, chronic lower back pain and irritable bowel syndrome, with an alleged onset date of September 12, 2008. Plaintiff later amended her alleged onset date to July 29, 2010. The claims were denied both initially and upon reconsideration. On September 24, 2012, Plaintiff (represented by counsel) appeared before an Administrative Law Judge ("ALJ"), who denied Plaintiff's claims in a written decision issued on November 5, 2012. On March 12, 2014, the Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision the final decision of the Commissioner.

Plaintiff now appeals the Commissioner's decision in this Court pursuant to 42 U.S.C. § 405(g), arguing that the ALJ erred in assessing Plaintiff's credibility and in assessing Dr. Gibellato's opinion. Defendant responds that the ALJ did not err and that substantial evidence supports the ALJ's decision. The parties have submitted cross-motions for summary judgment, which are now ripe for review.

Having reviewed the entire record in this case, the Court is now prepared to issue a

Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). For the reasons that follow,

the Court recommends that Plaintiff's Motion for Summary Judgment (ECF No. 8) be DENIED,

that Defendant's Motion for Summary Judgment (ECF No. 10) be GRANTED and that the final

decision of the Commissioner be AFFIRMED.

## I.     BACKGROUND

Because Plaintiff challenges the ALJ's decision, Plaintiff's education and work history,

medical records, state agency physicians' opinions, Plaintiff's function reports, and Plaintiff's

testimony are summarized below.

### A. Education and Work History

Plaintiff completed one year of college. (R. at 206.) Plaintiff last worked in the payroll

department of a construction company in 2008. (R. at 45-46.) Plaintiff also previously worked

as an office assistant, payroll clerk and insert operator. (R. at 46, 225.)

### B. Medical Records

In September 2006, Plaintiff began seeing Charles Gibellato, M.D. at Sheltering Arms.

(R. at 355-57, 361.) Plaintiff told Dr. Gibellato that she had been previously diagnosed with

fibromyalgia. (R. at 355.) Plaintiff experienced no acute distress, but had diffuse tenderness to

palpation. (R. at 356.) She had full strength in her extremities bilaterally with no focal motor

weakness, as well as full range of motion in her joints. (R. at 356.) Dr. Gibellato recommended

prescription pain medication and physical therapy. (R. at 356.)

An October 2006 x-ray of Plaintiff's spine yielded normal results. (R. at 371.)

Additionally, a hip x-ray produced similarly normal results. (R. at 371-72.) Plaintiff returned in

February 2007, reporting that she was doing better. (R. at 354.) In April 2007, Plaintiff reported that medications managed her pain. (R. at 353.)

On October 15, 2007, Plaintiff returned to Dr. Gibellato, complaining of hip and back pain. (R. at 348.) Plaintiff reported that heat and ice helped her condition, and that medication and treatment further afforded her between 90% and 100% relief. (R. at 348, 350.) On December 12, 2007, Plaintiff reported that injections, ice and heat helped her condition. (R. at 345.)

In May 2008, Dr. Gibellato discussed the relationship between stress, mood, insomnia and chronic pain with Plaintiff. (R. at 339.) Plaintiff returned to Dr. Gibellato in June 2008, reporting that she had started a new job with increased pay. (R. at 335.) She further reported that medications improved her condition, but stress made her condition worse. (R. at 335.) Treatment and medication afforded Plaintiff 60% relief. (R. at 337.)

In December 2008, Plaintiff had an improved gait, and she reported that her pain level was only a three out of ten. (R. at 329.) Medication, injections and heat all improved Plaintiff's condition. (R. at 329.) Treatment and medications improved Plaintiff's condition by approximately 80%. (R. at 331.)

In April 2009, Plaintiff reported that her pain registered as a four out of ten. (R. at 323.) In July 2009, Plaintiff further noted that she had 90% relief from her pain treatments and medications. (R. at 322.) In October 2009, Plaintiff reported that she experienced some relief from pain treatment and medications, as well as from her physical therapy sessions. (R. at 314-16.)

In January 2010, although Plaintiff complained of pain, she reported feeling better. (R. at 311.) Plaintiff also wanted to explore physical therapy. (R. at 311.) Treatment and medication

3

had afforded Plaintiff 90% relief. (R. at 313.) In May 2010, Plaintiff underwent an MRI of her lumbar spine that produced unremarkable results and revealed only mild degenerative changes. (R. at 364-65.) In July 2010, Plaintiff continued to complain about chronic pain, but she also reported that medication helped and that she felt better. (R. at 302.) Dr. Gibellato's notes reflected that Plaintiff reported that medication and pain treatment gave Plaintiff between 80% and 90% relief. (R. at 304.)

On October 19, 2010, Plaintiff reported that medications helped with her condition. (R. at 298.) Dr. Gibellato's notes further recorded that medication and pain treatment afforded Plaintiff about 70% to 80% relief. (R. at 300.) On October 26, 2011, Dr. Gibellato gave Plaintiff a steroid injection and facet joint injections. (R. at 400.) Plaintiff tolerated the injections well and experienced no complications. (R. at 400.)

In January 2011, Plaintiff again saw Dr. Gibellato, complaining of pain in her shoulders and lower extremities. (R. at 394.) Plaintiff received another injection for pain, and she reported that treatment and pain medication gave her 80% relief. (R. at 395-96.) On February 9, 2011, Dr. Gibellato gave Plaintiff injections for her pain without complication. (R. at 398.) On March 30, 2011, Plaintiff reported that her lower back pain had improved. (R. at 391.) Dr. Gibellato reported that injections afforded Plaintiff relief. (R. at 392.) Dr. Gibellato's notes further reflect that Plaintiff experienced 80% relief from her treatment and pain medications. (R. at 393.)

On July 27, 2011, Plaintiff complained to Dr. Gibellato of lower back pain. (R. at 455.) Plaintiff requested lower back injections and stated that she was seeing a podiatrist for foot problems. (R. at 455.) Dr. Gibellato's impression was that Plaintiff should see a psychologist for her depression and that she should discontinue sodas to combat her obesity. (R. at 456.) Dr.

Gibellato's notes indicated that medication and treatment had afforded her between 70% and 80% relief. (R. at 457.)

On September 19, 2011, Jennifer E. Wartella, Ph.D. saw Plaintiff for a psychological evaluation with the goals of reducing Plaintiff's anxiety and reaction to stress, as well as educating Plaintiff regarding the mind-body connection. (R. at 428-31.) Dr. Wartella noted that Plaintiff appeared mildly depressed, anxious, tired, cooperative and pleasant. (R. at 428.) Dr. Wartella further recorded that Plaintiff tended to catastrophize her pain. (R. at 428.) Plaintiff reported that she drank three to four sodas daily and tried to walk with her dogs each day. (R. at 430.) Plaintiff arrived at the appointment that day on time, walked without assistance to the examination room and was alert and oriented. (R. at 430.) Plaintiff maintained logical and linear thoughts during the appointment. (R. at 430.)

On October 26, 2011, Plaintiff returned to Dr. Gibellato, complaining of chronic pain. (R. at 452.) Plaintiff stated that she had several bad experiences recently and that she was seeing a foot specialist for her plantar fasciitis. (R. at 452.) Dr. Gibellato's notes indicated that injections improved Plaintiff's pain, but activity and stress made her pain worse. (R. at 452.) Dr. Gibellato advised Plaintiff on dietary changes to combat her obesity and on discontinuing soda to improve her esophagitis and constipation. (R. at 453.) Treatment and pain gave Plaintiff 50% relief, but more than that amount on some occasions. (R. at 454.)

On January 27, 2012, Plaintiff saw Dr. Gibellato regarding her chronic pain. (R. at 447.) Plaintiff was upset about losing a tooth and complained about her lousy psychiatrist. (R. at 447.) Dr. Gibellato's notes reflected that Plaintiff reported that treatment and medication afforded her 80% relief. (R. at 449.) Dr. Gibellato further ordered Plaintiff to physical therapy once per week

in Hanover for evaluation and treatment for range of motion, modalities and stabilization. (R. at 450.)

In February 2012, she attended a physical therapy session, complaining of pain. (R. at 438.) The physical therapist believed that Plaintiff had good potential for rehabilitation and noted that Plaintiff's plan for care included exercise, heat and ice. (R. at 440.) Plaintiff later reported that she experienced a decrease in pain and improvement in function. (R. at 435.) Plaintiff's physical therapist reported that Plaintiff had progressed well. (R. at 435.)

On May 8, 2012, Plaintiff returned to Dr. Gibellato, complaining of chronic pain. (R. at 444.) Plaintiff requested more injections and stated that they helped. (R. at 444.) Additionally, Plaintiff had stopped seeing her psychiatrist. (R. at 444.) Dr. Gibellato discussed with Plaintiff a weight loss program to combat her obesity and addressed the role of diet and exercise. (R. at 445.) Dr. Gibellato recorded that Plaintiff reported that treatment and medication provided her between 70% and 80% relief. (R. at 446.) On May 25, 2012, Dr. Gibellato referred Plaintiff to Spotsylvania Physical Therapy for treatment. (R. at 443.) He required evaluation and weekly treatment, specifically regarding Plaintiff's range of motion, modalities and stabilization. (R. at 443.)

On June 12, 2012, Plaintiff's representative, Ross Billman, interviewed Dr. Gibellato. (R. at 472-490.) Dr. Gibellato stated that Plaintiff used treatments such as medications, trigger point injections, physical therapy and home exercise programs. (R. at 473.) Dr. Gibellato opined that Plaintiff's anxiety contributed to her overall pain and made it difficult for her to get better. (R. at 474.) Dr. Gibellato further indicated that any job that Plaintiff performed would need to have a controlled climate, allow Plaintiff flexibility of movement and lack constant expectations. (R. at 483-84.)

On August 23, 2012, upon referral from Dr. Gibellato, Plaintiff underwent physical therapy with Lynn Hewette, P.T. at Sheltering Arms SMC Spine & Sport Center.  (R. at 468-71.) Plaintiff reported that she could tolerate sitting for approximately one hour, being up and about for two hours, walking for ten minutes and lifting about eight to ten pounds on good days.  (R. at 468.)  Plaintiff further reported being up and about most of the day.  (R. at 468.)  Although Plaintiff walked without an assistive device, she limped with her right leg.  (R. at 469.)  Ms. Hewette assessed that Plaintiff completed the physical therapy performance test successfully in the time allotted and that Plaintiff's lifting and walking abilities were consistent with sedentary work.  (R. at 470.)

On September 4, 2012, Dr. Gibellato wrote a letter to Plaintiff's representative, Ross Billman, stating that he had reviewed both Ms. Hewette's evaluation and the transcript of the conversation that Dr. Gibellato and Mr. Billman had earlier.  (R. at 506.)  Dr. Gibellato opined that he generally agreed with Ms. Hewette's assessment that Plaintiff could perform sedentary work, although a routine schedule could exacerbate Plaintiff's pain and fatigue.  (R. at 506.)

C.  State Agency Physicians

On December 27, 2010, Luc Vihn, M.D. assessed Plaintiff's residual functional capacity ("RFC").  Dr. Vihn determined that Plaintiff maintained the ability to occasionally lift or carry twenty pounds, frequently lift or carry ten pounds, stand and/or walk six hours in an eight-hour workday and sit (with normal breaks) for six hours in an eight-hour workday.  (R. at 66.)  Plaintiff could push and/or pull in an unlimited fashion.  (R. at 66.)  Plaintiff had no postural, manipulative, visual, communicative or environmental limitations.  (R. at 66-67.)

On May 24, 2011, William Amos, M.D. assessed Plaintiff's RFC.  Dr. Amos determined that Plaintiff could occasionally lift or carry twenty pounds, frequently lift or carry ten pounds,

stand and/or walk six hours in an eight-hour workday and sit (with normal breaks) for six hours in an eight-hour workday. (R. at 76.) Plaintiff further maintained the ability to push and/or pull in an unlimited fashion. (R. at 76.)

Dr. Amos determined that Plaintiff did have certain postural limitations. Plaintiff could frequently balance. (R. at 76.) Plaintiff could occasionally climb ramps/stairs, stoop, kneel, crouch and crawl. (R. at 76-77.) Plaintiff, however, could never climb ladders, ropes or scaffolds. (R. at 76.) Dr. Amos further opined that Plaintiff had no manipulative, visual, communicative or environmental limitations. (R. at 77.)

D. Function Report

On December 14, 2010, Plaintiff completed a function report. (R. at 216-23.) Plaintiff lived at home with her family. (R. at 216.) During a typical day, Plaintiff would wake up, take her medications and get her children ready for the day. (R. at 216.) Depending on the pain level, she would complete some household chores. (R. at 216.) During very good days, Plaintiff would do chores until dinner. (R. at 216.) During bad days, however, Plaintiff needed help and could not do much. (R. at 216.)

During low-pain days, Plaintiff cared for her children, such as helping with bath time and assisting with homework. (R. at 217.) Plaintiff noted that she could not do much during high-pain days. (R. at 217.) Depending on Plaintiff's pain, she would occasionally go out and walk with her dogs. (R. at 216-17.) Plaintiff could neither walk long distances nor hike since the onset of her condition. (R. at 217.) She could dress herself, bathe herself, feed herself and use the toilet, but she used a cane for assistance. (R. at 217.) Plaintiff did not need reminders to take care of her personal needs and her grooming, but her husband did help keep her medications organized. (R. at 218.)

8

Plaintiff prepared sandwiches, frozen dinners and other meals about two to three times each week. (R. at 218.) Her condition prevented her from preparing food as quickly, and she was not able to cook as much since her onset. (R. at 218.) Additionally, Plaintiff stated that she could not stand without being in pain. (R. at 218.) Plaintiff folded clothes, but pain sometimes prevented her from doing laundry. (R. at 218.) She further needed help to take laundry up and down stairs. (R. at 218.) Plaintiff tried to clean some every day. (R. at 223.)

Plaintiff went outside at least once or twice each week. (R. at 219.) Plaintiff did not go outside, however, if she experienced too much pain or the weather was cold. (R. at 219.) Although she mostly rode in a car, she sometimes drove. (R. at 219.) Plaintiff shopped both in stores and on the computer, and she shopped for groceries approximately once each month for a few hours. (R. at 219.) Although Plaintiff's husband paid the bills, Plaintiff maintained the ability to count change, handle a savings account and use a checkbook/money order. (R. at 219.)

Plaintiff's hobbies and interests included reading and sewing. (R. at 220.) Plaintiff read well and did so often. (R. at 220.) She sewed once or twice every few weeks, but back pain prevented her from enjoying it. (R. at 220.) Plaintiff spent time with others by talking on the phone or emailing. (R. at 220.) She would go to a couple of her son's sporting events each season. (R. at 220.)

Plaintiff reported that she did not go anywhere, and she needed no one to accompany her, because she went nowhere. (R. at 220.) Plaintiff had problems getting along with others because of her depression, and she was no longer social since the onset of her condition. (R. at 221.) Her condition affected her ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, complete tasks, concentrate, use her hands and get along with others. (R. at 221.) Plaintiff also stated that her condition affected her memory. (R. at 221.) Plaintiff tried to walk

about ten to twenty minutes each day. (R. at 221.) Plaintiff finished what she started, and she followed both written and spoken instructions "ok." (R. at 221.)

Plaintiff got along well with authority figures, and she had never been fired or laid off from a job because of problems getting along with others. (R. at 222.) Plaintiff stated that she handled lots of stress, which reacted with her fibromyalgia. (R. at 222.) Further, her routine consisted of being a shut-in with pain. (R. at 222.) She used a cane and a brace/splint, neither of which a doctor prescribed. (R. at 222.)

E. Plaintiff's Testimony

On September 24, 2012, Plaintiff (represented by counsel) testified at a hearing before the ALJ. (R. at 29-60.) Plaintiff was married, and she lived in a house with her husband, eighteen-year-old son and nine-year-old son. (R. at 40.) Plaintiff was first diagnosed with fibromyalgia in 2004 or 2005. (R. at 42.)

Plaintiff complained of widespread pain that ran from her upper shoulders, the back of her neck, down to her lower spine, through her hips and behind her legs through her knees. (R. at 43.) The intensity and location of the pain varied. (R. at 43.) Plaintiff stated that she had unpredictable flare-ups of pain, but if she had increased activity in her hips and legs, she could expect to have more pain there. (R. at 43-44.)

Plaintiff had a driver's license and was able to drive a car. (R. at 44.) During a good day, Plaintiff could go to a couple of stores and run errands. (R. at 45.) She had last been grocery shopping approximately two weeks before the hearing, and she usually went two to three times each month. (R. at 45.)

Plaintiff last worked in 2008. (R. at 46.) She was at her most recent job for ninety days before being let go due to a series of falls. (R. at 46.) Plaintiff testified that these falls led to

more intense flare-ups of pain. (R. at 47.) She further testified that she could not work because of the pain. (R. at 47.)

## II.     PROCEDURAL HISTORY

On March 19, 2010, Plaintiff protectively filed for DIB, alleging disability from fibromyalgia, chronic lower back pain and irritable bowel syndrome, with an alleged onset date of September 12, 2008. (R. at 15, 184-90.) Plaintiff later amended her alleged onset date to July 29, 2010. (R. at 15, 184-90, 206.) Plaintiff's claim was denied both initially and upon reconsideration. (R. at 61-80.) On September 24, 2012, the ALJ held a hearing during which Plaintiff (represented by counsel) and a VE testified. (R. at 29-60.) On November 5, 2012, the ALJ issued a written opinion, finding that Plaintiff was not disabled under the Act. (R. at 12-22.) The Appeals Council subsequently denied Plaintiff's request for review. (R. at 1-5.)

## III.     QUESTION PRESENTED

1. Did the ALJ err in affording Dr. Gibellato's opinion little weight?

2. Did the ALJ err in assessing Plaintiff's credibility?

## IV.     STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny benefits, the Court is limited to determining whether substantial evidence in the record supports the Commissioner's decision and whether the proper legal standards were applied in evaluating the evidence. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (citing *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005)). Substantial evidence is more than a scintilla, is less than a preponderance and is the kind of relevant evidence that a reasonable mind could accept as adequate to support a conclusion. *Hancock*, 667 F.3d at 472; *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996).

11

To determine whether substantial evidence exists, the Court must examine the record as a whole, but may not "'undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ].'" *Hancock*, 667 F.3d at 472 (quoting *Johnson*, 434 F.3d at 653). In considering the decision of the Commissioner based on the record as a whole, the Court must "'take into account whatever in the record fairly detracts from its weight.'" *Breeden v. Weinberger*, 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951)). The Commissioner's findings as to any fact, if substantial evidence in the record supports the findings, are conclusive and must be affirmed regardless of whether the reviewing court disagrees with such findings. *Hancock*, 667 F.3d at 477. If substantial evidence in the record does not support the ALJ's determination or if the ALJ has made an error of law, the Court must reverse the decision. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A sequential evaluation of a claimant's work and medical history is required to determine if a claimant is eligible for benefits. 20 C.F.R. §§ 404.1520, 416.920; *Mastro v. Apfel*, 270 F.3d 171, 177 (4th Cir. 2000). An ALJ conducts the analysis for the Commissioner, and it is that process that a court must examine on appeal to determine whether the correct legal standards were applied, and whether substantial evidence in the record supports the resulting decision of the Commissioner. *Mastro*, 270 F.3d at 176-77.

The first step in the sequence is to determine whether the claimant was working at the time of the application and, if so, whether the work constituted "substantial gainful activity" ("SGA"). 20 C.F.R. §§ 404.1520(b), 416.920(b). SGA is work that is both substantial and gainful as defined by the Agency in the C.F.R. Substantial work activity is "work activity that involves doing significant physical or mental activities. Your work may be substantial even if it

is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before." 20 C.F.R. § 404.1572(a).  Gainful work activity is work activity done for "pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b).  Taking care of oneself, performing household tasks or hobbies, therapy or school attendance, and the like, are not generally considered substantial gainful activities. 20 C.F.R. § 404.1572(c).  If a claimant's work constitutes SGA, the analysis ends and the claimant must be found "not disabled," regardless of any medical condition.  *Id.*

If the claimant establishes that she did not engage in SGA, the second step of the analysis requires her to prove that she has "a severe impairment . . . or combination of impairments which significantly limit[s] [her] physical or mental ability to do basic work activities." 20 C.F.R. § 416.920(c); *see also* 20 C.F.R. § 404.1520(c).  To qualify as a severe impairment that entitles one to benefits under the Act, it must cause more than a minimal effect on one's ability to function. 20 C.F.R. § 404.1520(c).

At the third step, if the claimant has an impairment that meets or equals an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (listing of impairments) and lasts, or is expected to last, for twelve months or result in death, it constitutes a qualifying impairment and the analysis ends. 20 C.F.R. §§ 404.1520(d), 416.920(d).  If the impairment does not meet or equal a listed impairment, then the evaluation proceeds to the fourth step in which the ALJ must determine whether the claimant can return to her past relevant work[1] based on an assessment of the claimant's RFC[2] and the "physical and mental demands of work [the claimant] has done in

---

[1]    Past relevant work is defined as SGA in the past fifteen years that lasted long enough for an individual to learn the basic job functions involved. 20 C.F.R. §§ 404.1565(a), 416.965(a).

[2]    RFC is defined as "an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule."

the past." 20 C.F.R. §§ 404.1520(e), 416.920(e).  If such work can be performed, then benefits will not be awarded.  *Id.*  The burden of proof remains with the claimant through step four of the analysis, such that she must prove that her limitations preclude her from performing her past relevant work.  *Bowen v. Yuckert,* 482 U.S. 137, 146 n.5 (1987); *Hancock,* 667 F.3d at 472.

However, if the claimant cannot perform her past work, the burden then shifts to the Commissioner at the fifth step to show that, considering the claimant's age, education, work experience and RFC, the claimant is capable of performing other work that is available in significant numbers in the national economy.  20 C.F.R. §§ 404.1520(f), 416.920(f); *Powers v. Apfel,* 207 F.3d 431, 436 (7th Cir. 2000) (citing *Yuckert,* 482 U.S. at 146 n.5).  The Commissioner can carry her burden in the final step with the testimony of a VE.  When a VE is called to testify, the ALJ's function is to pose hypothetical questions that accurately represent the claimant's RFC based on all evidence on record and a fair description of all of the claimant's impairments, so that the VE can offer testimony about any jobs existing in the national economy that the claimant can perform.  *Walker v. Bowen,* 889 F.2d 47, 50 (4th Cir. 1989).  Only when the hypothetical posed represents all of the claimant's substantiated impairments will the testimony of the VE be "relevant or helpful."  *Id.*  If the ALJ finds that the claimant is not capable of SGA, then the claimant is found to be disabled and is accordingly entitled to benefits.  20 C.F.R. §§ 404.1520(f)(1), 416.920(f)(1).

---

SSR-96-8p.  When assessing the RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (*i.e.,* 8 hours a day, 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record.  *Id.*  (footnote omitted).

## V. ANALYSIS

### A. The ALJ's Decision

On November 5, 2012, the ALJ issued a written opinion determining that Plaintiff was

not disabled under the Act. (R. at 15-22.) The ALJ followed the required five step sequential

analysis in coming to his decision.

At step one, the ALJ determined that Plaintiff had not engaged in SGA since her

amended alleged onset date. (R. at 17.) At step two, the ALJ found that Plaintiff had the severe

impairments of obesity, degenerative disc disease, degenerative joint disease, fibromyalgia and

depression. (R. at 17.) The ALJ further found that Plaintiff did not have an impairment or

combination of impairments that met or medically equaled the severity of one of the listed

impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 17-19.)

At step three, after consideration of the entire record, the ALJ determined that Plaintiff

maintained the RFC to perform sedentary work with certain restrictions. (R. at 19-22.) Plaintiff

was limited to carrying or lifting five pounds frequently and ten pounds occasionally, sitting six

hours in an eight-hour workday and standing/walking two hours in an eight-hour workday. (R.

at 19.) Further, Plaintiff had to avoid jobs with production quotas and overhead work. (R. at

19.) Plaintiff was limited to work that allowed her to change positions once an hour and that had

controlled heat, cold and humidity in an inside environment. (R. at 19.) Finally, Plaintiff was

limited to occasional interaction with peers, supervisors and the public, and could be absent

about ten days each year. (R. at 19.)

At step four, the ALJ determined that Plaintiff's RFC did not preclude her past relevant

work as a payroll clerk as actually and generally performed. (R. at 22.) Accordingly, because

Plaintiff could perform her past relevant work, the ALJ found that Plaintiff was not disabled

under the Act. (R. at 22.)

Plaintiff now challenges the ALJ's decision on two grounds. First, Plaintiff argues that the ALJ erred in affording little weight to the opinion of Dr. Gibellato. (Pl.'s Mem. in Supp. of Mot. for Summ. J. ("Pl.'s Mem.") (ECF No. 9) at 14-17.) Second, Plaintiff argues that the ALJ erred in assessing Plaintiff's credibility. (Pl.'s Mem. at 17-26.) Defendant argues that substantial evidence supports both of the ALJ's determinations. (Def.'s Mot. for Summ. J. and Br. in Supp. Thereof ("Def.'s Mem.") (ECF No. 10) at 15-23.)

B. The ALJ did not err in affording Dr. Gibellato's opinion little weight.

Plaintiff contends that the ALJ erred in affording Dr. Gibellato's opinion little weight. (Pl.'s Mem. at 14-17.) Specifically, Plaintiff argues that, although the ALJ gave reasons for diminishing the weight afforded Dr. Gibellato's opinion, the ALJ failed to articulate "good" reasons. (Pl.'s Mem. at 14-17; Pl.'s Reply to Def.'s Mot. for Summ. J. and Br. in Supp. Thereof ("Pl.'s Reply") (ECF No. 11) at 4-5.) Defendant responds that substantial evidence supports the ALJ's decision to afford Dr. Gibellato's opinion little weight. (Def.'s Mem. at 15-18.)

During the sequential analysis, when the ALJ determines whether the claimant has a medically-determinable severe impairment, or combination of impairments that would significantly limit the claimant's physical or mental ability to do basic work activities, the ALJ must analyze the claimant's medical records that are provided and any medical evidence resulting from consultative examinations or medical expert evaluations that have been ordered. 20 C.F.R. §§ 404.1512(a)-(e), 404.1527 , 416.912(a)-(e), 416.927. When the record contains a number of different medical opinions, including those from Plaintiff's treating sources, consultative examiners or other sources that are consistent with each other, then the ALJ makes a determination based on that evidence. 20 C.F.R. §§ 404.1520b(a), 416.920b(a). If, however, the

medical opinions are inconsistent internally with each other or other evidence, the ALJ must evaluate the opinions and assign them respective weight to properly analyze the evidence involved. 20 C.F.R. §§ 404.1527(c)(2)-(6), (e), 416.927(c)(2)-(6), (e).

Under the regulations, only an "acceptable medical source" may be considered a treating source that offers an opinion entitled to controlling weight. SSR 06-03p. Acceptable medical sources include licensed physicians, licensed or certified psychologists and certain other specialists, depending on the claimed disability. 20 C.F.R. §§ 404.1527(a), 416.913(a). The regulations also provide for the consideration of opinions from "other sources," including nurse-practitioners, physician's assistants or therapists. 20 C.F.R. §§ 404.1513(d), 416.913(d).[3]

Under the applicable regulations and case law, a treating source's opinion must be given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. *Craig*, 76 F.3d at 590; 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); SSR 96-2p. Further, the regulations do not require that the ALJ accept opinions from a treating source in every situation, *e.g.*, when the source opines on the issue of whether the claimant is disabled for purposes of employment (an issue reserved for the Commissioner), or when the treating source's opinion is inconsistent with other evidence or when it is not otherwise well-supported. 20 C.F.R. §§ 404.1527(c)(3)-(4), (d), 416.927(c)(3)-(4), (d).

The ALJ must consider the following when evaluating a treating source's opinion: (1) the length of the treating source relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) supportability based upon the medical record; (4)

---

[3] The regulations detail that "other sources" include medical sources that are not considered "acceptable medical sources" under 20 C.F.R. §§ 404.1513(a) and 416.913(a). The given examples are a non-exhaustive list.

consistency between the opinion and the medical record; (5) any specialization on the part of the treating source; and (6) any other relevant factors. 20 C.F.R. §§ 404.1527(c), 416.927(c). However, those same regulations specifically vest the ALJ — not the treating source — with the authority to determine whether a claimant is disabled as that term is defined under the Act. 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1). Although the regulations explicitly apply these enumerated factors only to treating sources, those same factors may be applied in evaluating opinion evidence from "other sources." SSR 06-03p.

In this case, the ALJ gave no treating source controlling weight and had to reconcile opinions from several different sources, including Dr. Gibellato, Dr. Vihn and Dr. Amos. Dr. Gibellato opined that Plaintiff could perform sedentary work, but would be unlikely to maintain a routine schedule. (R. at 506.) After reviewing Dr. Gibellato's records in exhibits 1F, 3F, 12F, 15F and 18F, the ALJ afforded Dr. Gibellato's opinion little weight, because Plaintiff's limitations were not supported by Dr. Gibellato's office notes and were inconsistent with Plaintiff's RFC. (R. at 22.) The ALJ did note, however, that he agreed with Dr. Gibellato's opinion to the extent that Dr. Gibellato opined that Plaintiff could perform sedentary work. (R. at 22.)[4]

Substantial evidence supports the ALJ's decision, because Plaintiff's limitations were inconsistent with Dr. Gibellato's office notes. In May 2010, Plaintiff underwent an MRI of her lumbar spine that showed only mild degenerative changes and returned otherwise unremarkable

---

[4]     The Court further notes that Dr. Gibellato indicated that any job that Plaintiff performed would need to be in a controlled climate and had to account for flexibility in allowing her to sit, stand or walk as Plaintiff saw fit, and further that constant expectations would increase Plaintiff's stress and affect her ability to perform that job. (R. at 483-84.) The ALJ accounted for these limitations in Plaintiff's RFC by limiting Plaintiff to jobs that allowed her to change positions and did not have production quotas. (R. at 19.) Further, Plaintiff was limited to jobs in controlled climates and jobs that allowed her to be absent ten days each year. (R. at 19.)

results. (R. at 364-65.) In July 2010, Dr. Gibellato's office notes indicated that Plaintiff reported feeling better and that medication helped her condition. (R. at 302.) Other notes indicated that treatment and medication afforded Plaintiff up to 90% relief. (R. at 304.) On October 19, 2010, Dr. Gibellato's notes again showed that medications helped Plaintiff's condition and provided her with up to 80% relief. (R. at 300.) A week later, Plaintiff received injections and experienced no complications. (R. at 400.)

In January 2011, Dr. Gibellato's notes reflected that Plaintiff reported that treatment and medication afforded her 80% relief. (R. at 394-96.) On March 30, 2011, Dr. Gibellato's notes showed that Plaintiff's lower back pain had improved. (R. at 391.) Further, the notes again reflected that medication and treatment provided Plaintiff with 80% relief. (R. at 393.) In July 2011, Dr. Gibellato's notes reflected that medication and treatment afforded Plaintiff 70% to 80% relief. (R. at 457.) On October 26, 2011, Dr. Gibellato recorded that injections improved Plaintiff's pain. (R. at 452.)

Dr. Gibellato's records from January 27, 2012, reflected that Plaintiff's medication and treatment afforded her 80% relief. (R. at 449.) On May 8, 2012, Dr. Gibellato recorded that injections improved Plaintiff's condition. (R. at 444.) Further, he noted that Plaintiff's medication and treatment provided Plaintiff with 70% to 80% relief. (R. at 446.) Therefore, substantial evidence supports the ALJ's decision to afford Dr. Gibellato's opinion little weight on the basis that his opinion was inconsistent with his office notes.

Additionally, other evidence in the record further supports the ALJ's decision to afford Dr. Gibellato's opinion little weight. Dr. Wartella reported that Plaintiff walked without assistance during her appointment and she was alert and oriented. (R. at 430.) Dr. Wartella further noted that Plaintiff tended to catastrophize her pain. (R. at 428.) In February 2012,

19

Plaintiff's physical therapist reported that Plaintiff had good potential for rehabilitation and that Plaintiff had progressed well. (R. at 435.) Ms. Hewette recorded that Plaintiff could tolerate sitting for approximately one hour, lifting approximately eight pounds, walking for ten minutes and being up and about for approximately two hours. (R. at 468.) Moreover, Plaintiff reported that she could complete household chores, care for her children, walk with her dogs, drive a car, go grocery shopping, cook meals and fold clothes. (R. at 44-45, 216-19.)

Therefore, substantial evidence supports the ALJ's decision to afford Dr. Gibellato's opinion little weight.

C. The ALJ did not err in determining Plaintiff's credibility.

Plaintiff next argues that the ALJ erred in assessing Plaintiff's credibility. (Pl.'s Mem. at 17-26.) Defendant contends that substantial evidence supports the ALJ's decision. (Def.'s Mem. at 15-23.)

After step three of the ALJ's sequential analysis, but before deciding whether a claimant can perform past relevant work at step four, the ALJ must determine the claimant's RFC. 20 C.F.R. §§ 416.920(e)-(f), 416.945(a)(1). The RFC must incorporate impairments supported by the objective medical evidence in the record and those impairments that are based on the claimant's credible complaints. In evaluating a claimant's subjective symptoms, the ALJ must follow a two-step analysis. *Craig*, 76 F.3d at 594; *see also* SSR 96-7p; 20 C.F.R. §§ 404.1529(a), 416.929(a). The first step is to determine whether there is an underlying medically determinable physical or mental impairment or impairments that reasonably could produce the individual's pain or other related symptoms. SSR 96-7p at 1-3. The ALJ must consider all of the medical evidence in the record. *Craig*, 76 F.3d at 594-95; SSR 96-7p at 5, n.3; *see also* SSR 96-8p at 13 ("The RFC assessment must be based on all of the relevant

20

medical evidence in the record . . . ."). If the underlying impairment reasonably could be expected to produce the individual's pain, then the second part of the analysis requires the ALJ to evaluate a claimant's statements about the intensity and persistence of the pain and the extent to which it affects the individual's ability to work. *Craig*, 76 F.3d at 595. The ALJ's evaluation must take into account "all the available evidence," including a credibility determination of the claimant's statements regarding the extent of the symptoms, and the ALJ must provide specific reasons for the weight given to the individual's statements. *Craig*, 76 F.3d at 595-96; SSR 96-7p at 5-6, 11.

This Court must give great deference to the ALJ's credibility determinations. *Eldeco, Inc. v. N.L.R.B.*, 132 F.3d 1007, 1011 (4th Cir. 1997). The Fourth Circuit has determined that "[w]hen factual findings rest upon credibility determinations, they should be accepted by the reviewing court absent 'exceptional circumstances.'" *Id.* (quoting *N.L.R.B. v. Air Prods. & Chems., Inc.*, 717 F.2d 141, 145 (4th Cir. 1983)). Therefore, this Court must accept the ALJ's factual findings and credibility determinations unless "'a credibility determination is unreasonable, contradicts other findings of fact, or is based on an inadequate reason or no reason at all.'" *Id.* (quoting *N.L.R.B. v. McCullough Envtl. Servs., Inc.*, 5 F.3d 923, 928 (5th Cir. 1993)).

Furthermore, Plaintiff's subjective allegations of pain do not alone provide conclusive evidence that Plaintiff is disabled. *Mickles v. Shalala*, 29 F.3d 918, 919 (4th Cir. 1994). Instead, "subjective claims of pain must be supported by objective medical evidence showing the existence of a medical impairment which could reasonably be expected to produce the actual pain, in the amount and degree, alleged by the claimant." *Craig*, 76 F.3d at 591.

In this case, the ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, Plaintiff's statements concerning the intensity, persistence and limiting effects of those symptoms were not credible to the extent that they were inconsistent with Plaintiff's RFC assessment. (R. at 21.) Specifically, the ALJ diminished Plaintiff's credibility, because Plaintiff's complaints were out of proportion with the medical evidence, because of the conservative nature of Plaintiff's treatment and because of Plaintiff's admitted activities of daily living and functional capabilities. (R. at 21.)

Substantial evidence supports the ALJ's determination on the basis that Plaintiff's complaints were out of proportion with the medical evidence. Dr. Wartella opined that Plaintiff tended to catastrophize her pain. (R. at 428.) Throughout 2009, medical records indicated that treatment and medication afforded Plaintiff relief. (R. at 314-16, 320, 322-23.) In July 2010, Plaintiff reported that medication helped her condition and that she felt better. (R. at 302.) Medical records showed that medication and treatment afforded Plaintiff between 80% and 90% relief. (R. at 304.) In the fall of 2010, Dr. Gibellato's records indicate that Plaintiff reported that medications helped her condition, and Dr. Gibellato gave Plaintiff injections that Plaintiff tolerated well and presented no complications. (R. at 298, 400.)

Though Plaintiff complained of pain in her shoulders and lower extremities, Dr. Gibellato's records reflected that in January 2011, medications and treatment afforded Plaintiff 80% relief. (R. at 394-96.) Later that year, Dr. Gibellato again gave Plaintiff injections without complication. (R. at 455.) Plaintiff also continued to report that medication and treatment afforded her between 70% and 80% relief. (R. at 457.)

In August 2011, Dr. Wartella reported that Plaintiff walked without assistance to the examination room, was alert and oriented, and maintained logical and linear thoughts. (R. at

22

429-30.) In October 2011, Dr. Gibellato again reported that injections improved Plaintiff's pain and that treatment and medications continued to afford Plaintiff relief. (R. at 452, 454.) Further, throughout 2012, records continue to reflect that treatment and medication afforded Plaintiff between 70% and 80% relief. (R. at 446, 449, 457.)

Substantial evidence further supports the ALJ's determination on the basis of Plaintiff's conservative treatment. In April 2007, Plaintiff reported that medications managed her pain. (R. at 353.) On multiple occasions, Plaintiff reported that ice and heat helped her condition. (R. at 329, 345.) Additionally, in February 2012, the physical therapist reported that Plaintiff had good potential for rehabilitation, noting that the rehabilitation plan included exercise, heat and ice. (R. at 438-40.) Plaintiff reported a decrease in pain and improvement in function after physical therapy sessions. (R. at 435, 440.) After July 2010, Plaintiff repeatedly reported — and Dr. Gibellato's notes consistently reflected — that medication and injections afforded Plaintiff at least 80% relief. (R. at 300, 304, 393, 396, 457.)

Substantial evidence further supports the ALJ's decision to diminish Plaintiff's credibility on the basis of Plaintiff's own admitted daily activities. Plaintiff reported that, depending on pain, she would attempt to complete chores every day. (R. at 216.) During good days, Plaintiff would do chores until dinner. (R. at 216.) Plaintiff cared for her children and helped at bath time. (R. at 217.) Plaintiff reported that she would walk with her dogs. (R. at 216-17.) She could feed and dress herself, and she prepared sandwiches, frozen dinners and other meals multiple times each week. (R. at 217-18.) Plaintiff folded clothes, and she shopped for groceries. (R. at 218-19.) Plaintiff testified that she could drive a car and maintained a driver's license. (R. at 44.) She further testified that she could run errands and go to stores. (R. at 45.) Therefore, substantial evidence supports the ALJ's credibility determination.

## V.    CONCLUSION

For the reasons set forth above, the Court recommends that Plaintiff's Motion for Summary Judgment (ECF No. 8) be DENIED, that Defendant's Motion for Summary Judgment (ECF No. 10) be GRANTED and that the final decision of the Commissioner be AFFIRMED.

Let the clerk forward a copy of this Report and Recommendation to the Honorable Henry E. Hudson and to all counsel of record.

### NOTICE TO PARTIES

**Failure to file written objections to the proposed findings, conclusions and recommendations of the Magistrate Judge contained in the foregoing report within fourteen (14) days after being served with a copy of this report may result in the waiver of any right to a de novo review of the determinations contained in the report and such failure shall bar you from attacking on appeal the findings and conclusions accepted and adopted by the District Judge except upon grounds of plain error.**

_____ /s/

David J. Novak
United States Magistrate Judge

Richmond, Virginia
Date: March 3, 2015

24